# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                         )
JORGE WASHINGTON ACOSTA    )
ORELLANA, et al.,                  )
                         )
       Plaintiff,           )
                         )
       v.                 )     Civil Action No. 08-1790 (RBW)
                         )
CROPLIFE INTERNATIONAL, et al.,  )
                         )
       Defendants.        )
_____)

## MEMORANDUM OPINION

The plaintiffs bring this action alleging injuries arising from "exposure to the agrochemical Mancozeb," a fungicide used to treat bananas on plantations in Ecuador to prevent the "sigatoka negra" or "black banana" fungus, First Amended Complaint ("Am. Compl.") ¶¶ 1-2, against numerous defendants, including several corporate entities that allegedly promoted the use of Mancozeb, produced it, sold it, or used it, id. ¶¶ 3-6. This matter is currently before the Court on the motion of defendants CropLife International ("CropLife I") and CropLife America ("CropLife A") (collectively, the "CropLife Defendants") to dismiss the plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), alleging that it fails to state a claim upon which relief can be granted, or, alternatively, that the CropLife Defendants are entitled to summary judgment. Defendants CropLife America and CropLife International's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted or, in the Alternative, for Summary Judgment ("Defs.' Mot."). The plaintiffs oppose the CropLife Defendants' motion.[1] Plaintiffs' Opposition to Defendants CropLife America and CropLife International's

---

[1]     The Court also considered the following documents in resolving this motion: Memorandum of Points and

(continued . . . )

Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted or, in the

Alternative, for Summary Judgment ("Pls.' Opp'n"). For the reasons that follow, the Court finds

that the plaintiffs have failed to adequately allege an actionable claim against the CropLife

Defendants, and accordingly the CropLife Defendants motion to dismiss the plaintiffs' amended

complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) must be granted.[2]

## I. BACKGROUND

According to the plaintiffs, although Mancozeb is "highly effective" at curtailing

"sigatoka negra" or "black banana," a "fungal plague that can wipe out an entire crop" of

bananas, it is also "highly toxic to humans." Am. Compl. ¶ 2 (alleging that due to its toxicity,

the United States government temporarily banned Mancozeb's use, but now "permit[s its] use

under extremely restricted conditions"). The plaintiffs contend that they have suffered "a variety

of serious health problems, including cancer, respiratory problems, neurological problems,

sterility, and birth defects," all directly "attributable to excessive and unlawful exposure to

Mancozeb." Id. ¶ 1. Comprised of five groups – (1) pilots who fumigated with Mancozeb, (2)

ground crews employed by fumigation companies, (3) banana plantation workers, (4) other

individuals who were knowingly exposed to Mancozeb, and (5) the Municipality of Pueblo Viejo

– the plaintiffs seek "compensatory and punitive damages," "equitable relief including medical

---

(. . . continued)
Authorities in Support of Defendants CropLife America and CropLife International's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted or, in the Alternative, for Summary Judgment ("Defs.' Mem."), Reply Memorandum of Points and Authorities in Support of Defendants CropLife America and CropLife International's Motion to Dismiss For Failure to State a Claim Upon Which Relief Can be Granted or, in the Alternative, for Summary Judgment (Defs.' Reply), Defendants CropLife America and CropLife International's Notice of Supplemental Authority in Support of Their Pending Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Notice"), and Plaintiffs' Response to Defendants' Notice of Supplemental Authority ("Pls.' Reply").

[2]      Given the Court's finding that dismissal of the plaintiffs' complaint under Rule 12(b)(6) is appropriate for the reasons set forth in this Memorandum Opinion, it need not address the CropLife Defendants' arguments for summary judgment.

monitoring and environmental cleanup," "costs of suit," and disgorgement "of the [d]efendants'
profits from their unlawful activity," as well as permanently enjoining the defendants from
further engaging in the alleged unlawful activities of promoting Mancozeb's use, producing it,
selling it, or using it.  Id. ¶¶ 1, 8, 400.

     The plaintiffs overriding theory of their case is that all the defendants named in their
amended complaint[3] "promoted [Mancozeb] in Ecuador as a 'green' chemical that had no
adverse effects on humans," despite the fact that they knew "the chemical was hazardous to
humans."  Id. ¶ 4.  The plaintiffs allege that the defendants "provided false and misleading
information in Ecuador regarding Mancozeb" in order to "increase the productivity of their
banana plantations and increase revenues from the sale of bananas to foreign markets."  Id. ¶ 6.
The plaintiffs allege that the defendants were successful in their endeavor, resulting in the
increased sale and use of Mancozeb in Ecuador between 2004 and 2006.  Id. ¶ 5.

     It is undisputed that the CropLife Defendants neither "manufacture[] any crop protection
or pest control products themselves, nor . . . engage in the application or use of the products
developed and manufactured by their members," Defs.' Mem. at 4; see generally Am. Compl.,
and therefore the plaintiffs' theory of liability against these defendants is premised upon their
alleged "business decision to promote the use of Mancozeb in Ecuador," Am. Compl. ¶ 305
(emphasis added).  Specifically, the plaintiffs charge that the CropLife Defendants' efforts to
promote the use of Mancozeb give rise to seven common law causes of action,[4] as well as

---

[3]     Besides the CropLife Defendants, the plaintiffs also seek to hold a third CropLife entity, CropLife Ecuador,
liable based on the same allegations, as well as numerous other defendants classified as the "Mancozeb Producer
Defendants," the "Banana Producer Defendants," and a class of yet-to-be identified "Doe Defendants."  See Am.
Compl. ¶¶ 303-344.  Although other motions are currently pending before the Court, this Order addresses only the
motion to dismiss brought by CropLife A or CropLife I.

[4]     The plaintiffs have pled the following causes of action: Count I – Battery, Count II – Assault, Count III –
Fraudulent Concealment, Count V – Negligent Supervision, Count VI – Trespass, Count VIII – Nuisance (and

(continued . . . )

subject the CropLife Defendants to liability under three theories of vicarious liability for the tortious conduct of the other named defendants in this action.[5]  See generally Am. Compl.

The CropLife Defendants respond that the plaintiffs' allegations have "no basis in reality," because, as trade associations, the CropLife Defendants "have nothing to do with either Ecuador or [M]ancozeb."[6]  Defs.' Mem. at 1.  Accordingly, it is the CropLife Defendants' position that the plaintiffs have not alleged any factual basis for their claims, "rely[ing instead] on conclusory speculation" and failing to "so much as identif[y] a single specific fact . . . in their Complaint that support their claims."  Defs.' Reply at 1.  With respect to each cause of action, the CropLife Defendants assert that the plaintiffs "have [either] failed to allege at least one . . . essential element," or make "vague, conclusory, and baseless" allegations, such that the plaintiffs do not adequately state a single "claim against [CropLife A] or [CropLife I] upon which relief can be granted." Defs.' Mem. at 2-3.  Accordingly, the CropLife Defendants seek dismissal of the plaintiffs' amended complaint.

## II.  CHOICE OF LAW

As an initial matter, the Court must address the plaintiffs' position that they are seeking to hold the CropLife Defendants liable under both domestic law and "the laws of Ecuador."  See, e.g., Am. Compl. ¶ 363 ("[t]he acts described herein constitute battery, actionable under the laws of the District of Columbia, the laws of the United States and the laws of Ecuador"); id. ¶ 366

---

(. . . continued)
Nuisance Per Se, and Count IX – Strict Liability.  Am. Compl. ¶¶ 361-98.  Although originally the plaintiffs sought to hold the CropLife Defendants liable under two additional causes of action – negligence per se and negligent trespass – the plaintiffs have since conceded those claims.  See infra n.7.

[5]     Specifically, the plaintiffs' theories of vicarious liability are aiding and abetting, conspiracy, and agency. Am. Compl. ¶¶ 306-07, 359.

[6]     As not-for-profit trade associations, CropLife A or CropLife I acknowledge that they promote the interests of "the major manufacturers, formulators, and distributors of crop protection and pest control products in the [United States]," and "the interests of the global plant science industry as a whole."  Defs.' Mem. at 4.

("[t]he acts described herein constitute assault, actionable under the laws of the District of Columbia, the laws of the United States and the laws of Ecuador").  When the choice of law is disputed in a diversity action, this Court applies the choice of law rules of the District of Columbia in making that determination.  Doe v. Roe, 841 F. Supp. 444, 446 (D.D.C. 1994).[7] The party seeking to have the Court apply foreign law bears the burden of providing the Court with information concerning the foreign law it claims should be applied, and if "both parties have failed to prove foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum."  Oparaugo v. Watts, 884 A.2d 63, 71 (D.C. 2005) (citation omitted).  Indeed, where the party seeking to have the Court apply foreign law "fail[s] to provide any information on the elements" of an alleged tort under foreign law, "it [is] permissible for the trial court to apply the law of the District of Columbia."  Id. at 72.  Here, because the plaintiffs have had a "meaningful opportunity to raise the foreign law issue" and have thus far neglected "to provide [any] information on what the applicable foreign law [is]," id., the Court will apply the law of the District of Columbia and not the law of Ecuador.[8]

---

[7]    The District of Columbia employs "a modified governmental interests analysis," which evaluates the "governmental policies underlying the applicable laws" to "determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review." Washkoviak v. Student Loan Mktg. Ass'n, 900 A.2d 168, 180 (D.C. 2006) (citations and internal quotation marks omitted).  Four other factors are also relevant to this consideration: (1) "the place where the injury occurred;" (2) "the place where the conduct causing the injury occurred;" (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties;" and (4) "the place where the relationship between the parties is centered."  Doe, 841 F. Supp. at 446.

[8]    Although the failure to provide this Court meaningful information on Ecuadorian law justifies the Court applying District of Columbia law, under the government interests analysis the same outcome would likely result. Despite the fact that the injuries occurred in Ecuador and the plaintiffs are Ecuadorian, the defendants are, for the most part, American corporate entities with relationships centered in the United States, and therefore the interest in applying District of Columbia law likely outweighs that of applying Ecuadorian law.  See Doe v. Exxon Mobil Corp., No. 05-CV-63, 2006 WL 516744, at *2 (D.D.C. June 8, 2006) (noting that "[u]ltimately, the United States . . . has an overarching, vital interest in the safety, prosperity, and consequences of the behavior of its citizens, particularly its super-corporations conducting business in one or more foreign countries").  Moreover, as a general proposition, the law of the forum where an action is brought is "presumed to apply[,] unless it is demonstrated that a foreign jurisdiction has a greater interest in the controversy than does the [forum]," Doe, 841 F. Supp. at 446, and in the event this Court "cannot determine from the pleadings which jurisdiction has a greater interest in the controversy, in ruling on a motion to dismiss [this Court] must apply the law of the forum state," Washkoviak, 900

(continued . . . )

# III.  STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint has properly stated a claim upon which relief may be granted.  Woodruff v. DiMario, 197 F.R.D. 191, 193 (D.D.C. 2000).  For a complaint to survive a Rule 12(b)(6) motion, Federal Rule of Civil Procedure 8(a) requires that it provide only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although Rule 8(a) does not require "detailed factual allegations," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), a plaintiff is required, to provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009), in order to "give the defendant fair notice of what the claim is and the grounds on which it rests," Twombly, 550 U.S. at 555 (internal citation, quotation marks and alteration omitted).  Thus, while "detailed factual allegations are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to adequately assert grounds showing entitlement to relief, a plaintiff must furnish more than labels and conclusions or a formulaic recitation of the elements of a cause of action." Hinson ex rel N.H. v. Merritt Educ. Ctr., 521 F. Supp. 2d 22, 27 (D.D.C. 2007) (quoting Twombly, 550 U.S. at 555) (internal quotation marks and alterations omitted).  Or, as the Supreme Court more recently stated, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556).

---

(. . . continued)
A.2d at 182.

A complaint alleging facts which are "'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. (quoting Twombly 550 U.S. at 557). Moreover, "[a] dismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks and citations omitted) (emphasis in original). Finally, in evaluating a Rule 12(b)(6) motion, "[t]he complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (quotation marks and citations omitted), and the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice," E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (footnote omitted). In sum, although the Court must accept the plaintiffs' factual allegations as true, any conclusory allegations are not entitled to an assumption of truth and even those allegations pled with factual support need only be accepted to the extent that "they plausibly give rise to an entitlement to relief." Iqbal, 129 S. Ct. at 1950. And, dismissal for failure to state a claim is "proper when . . . the court finds that the plaintiffs have failed to allege all the material elements of their cause of action." Taylor v. FDIC, 132 F.3d 753, 761 (D.C. Cir. 1997).

## IV. LEGAL ANALYSIS

The plaintiffs allege that the CropLife Defendants are liable under seven theories of liability, as well as three theories of vicarious liability. The CropLife Defendants contend that none of these theories of liability presents a viable claim. For the reasons below, the Court finds

that the CropLife Defendants' motion must be granted, either because the plaintiffs have failed to adequately plead all the essential elements of a claim or plead the claim with the level of particularity required by Federal Rule of Civil Procedure 8(a).

## A.      The Plaintiffs' Theories of Direct Liability[9]

With respect to the plaintiffs' claims in their amended complaint alleging liability against the CropLife Defendants arising directly from their alleged actions (i.e. battery, assault, trespass, fraud, negligent supervision, nuisance, and strict liability), all of these claims must be dismissed under Federal Rule of Civil Procedure 12(b)(6).

### 1.      The Intentional Tort Claims

In attempting to assert claims for battery, assault, and trespass, the plaintiffs have failed to plead that the CropLife Defendants intended to commit these acts, rendering each of these claims legally unsustainable.

#### a.      The Plaintiffs' Claims for Battery (Count I)

The plaintiffs argue that by "causing the excessive and unlawful use of Mancozeb in Ecuador" the defendants "committed acts which resulted in harmful or offensive contact with the bodies of the . . . proposed classes [of the plaintiffs]." Am. Compl. ¶ 362. They further allege that these contacts were committed without their consent causing them to sustain injuries and therefore "constitute battery, actionable under the laws of the District of Columbia." Id. ¶¶ 362-63. In response, the CropLife Defendants argue that the plaintiffs have fail to adequately allege the elements of a battery. Specifically, the CropLife Defendants assert that, despite the

_____

[9]      Initially, the plaintiffs sought to impose liability based on two additional grounds: negligent trespass (Count VII) and negligence per se (Count IV); however, the plaintiffs have since conceded that "the CropLife Defendants cannot be held liable for negligent trespass and negligence per se," Pls.' Opp'n at 9 n.3. Accordingly, these claims are dismissed against the CropLife Defendants.

requirement that "intent to bring about bodily contact is 'one of the essential elements of the tort of battery,'" the "[p]laintiffs fail[] to allege that [the CropLife Defendants] acted with intent to cause bodily contact."[10]  Defs.' Mem. at 7 (quoting Madden v. D.C. Transit Sys., Inc., 307 A.2d 756, 757 (D.C. 1973) (per curiam)).

A claim for battery is actionable only if the plaintiff has alleged that the defendant has committed (a) "harmful or offensive contact with a person," which, (b) "result[s] from an act intended to cause that person to suffer such a contact."  Person v. Children's Hosp. Nat. Med. Ctr. 562 A.2d 648, 650 (D.C. 1989) (citation and alterations omitted).  Thus, intent is "one of the essential elements of the tort of battery," and a battery claim that rests on "nothing more than legal conclusions" may be properly dismissed under Rule 12(b)(6).  Madden, 307 A.2d at 757 & n.1.

Although the plaintiffs allege that the "[d]efendants committed acts which resulted in harmful or offensive contact," they do not allege that the CropLife Defendants acted with any intent to commit such contact.  See Am. Compl. ¶ 362.  While it is appropriate for a court to infer the element of intent from the circumstances as alleged in a complaint, Gonzales v. Carhart, 550 U.S. 124, 155 (2007) ("It is true that intent to cause a result may sometimes be inferred if a person 'knows that that result is practically certain to follow from his conduct.'" (citation omitted)), in the this case there are no factual allegations in the amended complaint upon which

---

[10]      The plaintiffs generally argue that "issues of intent and causation are inappropriate for resolution on a motion to dismiss," Pls.' Opp'n at 9, and cite to case law purporting to substantiate this assertion, id. at n.4.  The plaintiffs' argument, however, is misleading, and is only accurate to the extent that it concerns factual disputes over issues of intent and causation.  See e.g., Estate of Klieman v. Palestinian Auth., 424 F. Supp. 2d 153, 167 (D.D.C. 2006) (declining to resolve question of intent at motion to dismiss stage because it involved "disputed questions of material fact").  In this case, the defendants do not challenge specific facts regarding their intent or the lack of causation; rather, they make the distinct argument that, as a threshold matter, the plaintiffs have failed to even adequately plead intent (an essential element of assault and two of the other torts being asserted by the plaintiffs).  Thus, assessing the issue of whether the plaintiffs have pled intent is indeed entirely appropriate.

to base such an inference.  Moreover, the notion that the CropLife Defendants acted with the requisite intent cannot be easily reconciled with the plaintiffs' overall allegation that the CropLife Defendants' motivation in promoting Mancozeb was to "increase revenues from the sale of bananas,"  Am. Compl. ¶ 6; see Evans-Reid v. District of Columbia, 930 A.2d 930, 937 (D.C. 2007) (relying upon the Restatement (Second) of Torts); Madden, 307 A.2d at 757 (same); Restatement (Second) of Torts § 18 (2009) ("In order that the actor may be liable . . . [for intending to cause a harmful or offensive contact], it is necessary that an act be done for the purpose of bringing about a harmful or offensive contact or an apprehension of such contact to another or to a third person or with knowledge that such a result will, to a substantial certainty, be produced by his act. It is not enough to make the act intentional that the actor realize that it involves any degree of probability of a harmful or offensive contact or an apprehension of such contact, less than a substantial certainty that it will so result." (emphasis added)).  Indeed, this acknowledged motivation by the CropLife Defendants is entirely inconsistent with personal intent on their part to commit battery on the plaintiffs.  Accordingly, the plaintiffs have not sufficiently stated a claim of direct liability for battery against the CropLife Defendants, and this component of their claim must be dismissed.[11]  See, e.g., Madden, 307 A.2d at 757 (dismissing

---

[11]        Although the failure to plead intent is sufficient grounds upon which to dismiss the plaintiffs' battery claim based on the theory of direct liability, the claim could be dismissed for another reason as well.  In the District of Columbia Circuit, it "is well understood . . . that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  Hopkins v. Women's Div. Gen. Bd. of Global Ministries, 238 F. Supp. 2d 174, 178 (D.D.C. 2002); see also United States v. Parcel 03179-005R, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) (collecting cases).  Here, although the CropLife Defendants raised the argument that the battery claim should be dismissed in their motion to dismiss, Defs.' Mem. at 7-9, the plaintiffs failed to address why these defendants can be held accountable for the injuries they allegedly sustained under the theory of direct liability, arguing only that these defendants can be held accountable under theories of indirect liability in their opposition motion, see generally Pls.' Opp'n, and this failure would warrant the Court finding that the plaintiffs have conceded the dismissal of their battery claim based on direct liability.

the plaintiff's battery action for failure to state a claim as a result of the plaintiff's failure to plead intent).

### b. The Plaintiffs' Claim for Assault (Count II)

The plaintiffs assert that the defendants, in "spraying or exposing all of the [p]laintiffs with toxic poison repeatedly and across a period of indefinite time," were responsible for causing the plaintiffs "to be apprehensive that [the d]efendants would subject them to imminent batteries and/or intentional invasions of their rights." Am. Compl. ¶ 365. Therefore, the plaintiffs allege that the defendants' conduct demonstrated "a present ability to subject [the plaintiffs] to an immediate, intentional, offensive and harmful touching" to which the plaintiffs "did not consent," and accordingly the defendants' acts "constitute assault." Am. Compl. ¶¶ 365-66. In response, the CropLife Defendants argue that the plaintiffs do not state a claim for assault because the plaintiffs neither "allege intent on the part of [CropLife A] or [CropLife I] to place [the p]laintiffs in apprehension of an immediate battery," nor identify "any conduct on the part of [CropLife A] or [CropLife I] that resulted in [the p]laintiffs' apprehension of an immediate contact with Mancozeb." Defs.' Mem. at 9-10.

In the District of Columbia, defendants are subject to liability for assault if "(a) [they] act[] intending to cause a harmful or offensive contact . . . , or an imminent apprehension of such a contact, and (b) the other [party] is thereby put in such imminent apprehension." Rogers v. Loews L'Enfant Plaza Hotel, 526 F. Supp. 523, 529 (D.D.C. 1981). An actor will not be held liable for assault for negligent or reckless behavior lacking the requisite intent to commit an assault. See Jackson v. District of Columbia, 412 A.2d 948, 955 n.15 (D.C. 1980). Also, an "essential element of . . . assault is . . . intentional putting another in apprehension" and absent

such an allegation a complaint is "clearly deficient." See Madden, 307 A.2d at 757 (emphasis added).

The plaintiffs again fail to plead intent as the basis for finding direct liability for the assault claims lodged against the CropLife Defendants, an omission that renders the pleading of the assault claim against them incomplete. Even accepting all the allegations in the complaint as true, the plaintiffs simply never allege that the CropLife Defendants either intended to cause a harmful or offensive contact with the plaintiffs, or intentionally caused the plaintiffs to be placed in apprehension of such contact. Am. Compl. ¶¶ 364-66. Further, just because the plaintiffs were in fact subjected to such apprehension does not alone give rise to a viable assault claim, as the plaintiffs are required to plead that the apprehension was the result of an act intended by a defendant to cause such apprehension. See Madden, 307 A.2d at 757. Absent such an allegation, the plaintiffs' claims amount at most to allegations of negligent or reckless behavior, which clearly fall short of assault. See Jackson, 412 A.2d at 955 n.15. For these reasons, the plaintiffs have failed to state a claim for assault based on direct liability and this aspect of their assault claim must be dismissed.[12]

### c. The Plaintiffs' Claim for Trespass (Count VI)

Some of the plaintiffs assert claims against the CropLife Defendants for "excessive and unlawful spraying of Mancozeb on the homes and farms" of these designated plaintiffs that has allegedly "resulted in and continues to cause the contamination of these properties with . . . Mancozeb."[13] Am. Compl. ¶ 381. According to these plaintiffs, because the alleged acts were

---

[12]     Because the CropLife Defendants argue in their motion for universal dismissal of the assault claim for failure to state a claim, Defs.' Mem. at 9-11, and the plaintiffs do not address this argument to that same degree in their opposition motion, see generally Pls.' Opp'n, this failure would also again warrant the Court finding that the plaintiffs have conceded the dismissal of their assault claim based on the theory of direct liability.

[13]     As noted earlier, the plaintiffs consist of four categories of individuals and a municipality, all of whom

(continued . . . )

"intentional, reckless and unprivileged . . . and proximately resulted . . . in the intrusion and

contamination" of the plaintiffs' property, the CropLife Defendants' acts are actionable as claims

for trespass.  Id. at 382.  In response, the CropLife Defendants challenge this theory of liability,

arguing that these plaintiffs "have failed to allege that [the CropLife Defendants] committed any

act that constituted an unlawful entry upon any [of the plaintiffs'] home[s], farm[s], or land."

Defs.' Mem. at 17.

In the District of Columbia, the tort of trespass is comprised of two elements: (1) an

"intentional intrusion of a person or thing upon property" that (2) "invades and disrupts the

owner's exclusive possession of that property."  Daily v. Exxon Corp., 930 F. Supp. 1, 2 (D.D.C.

1996).  With respect to the requirement of pleading intent on behalf of the CropLife Defendants,

the plaintiffs need not allege that these defendants had "specific intent to invade unlawfully the

property of another;" however, the plaintiff must allege some form of "volition, i.e. a conscious

intent to do the act that constitutes the entry upon someone else's . . . property."  Nat'l Tel. Coop.

Ass'n v. Exxon Corp., 38 F. Supp. 2d 1, 12 (D.D.C. 1998) (citation omitted).  Trespass, however,

is not a "strict-liability formulation," and it is not enough "that the defendant intentionally do

some act that ultimately results in harm to property."  Id.  Instead, the defendant "must intend the

act which amounts to or produces the unlawful invasion, and the intrusion must at least be the

immediate or inevitable consequence of what [the defendant] willfully does."  Id. (emphasis

---

(. . . continued)
were allegedly injured by the use of Mancozeb.  Am. Compl. ¶ 8.  Two of the categories of plaintiffs assert claims
with respect to real property located in Ecuador.  These two categories include a group the plaintiffs define as the
"Resident Plaintiffs" (i.e. parents and their children "who lived in areas near banana plantations that either were
owned or controlled by the Banana Producer Defendants . . . or they lived near other banana plantations that
followed the guidelines and regulations provided by CropLife," and who "were exposed to excessive and unlawful
amounts of Mancozeb," id. ¶ 8(4)) and a  "Municipality" (i.e. the Municipality of Pueblo Viejo, which the plaintiffs
argue "has been damaged by the heavy concentration of fumigations occurring within the Municipality, requiring it
to incur substantial damages in providing health and social services for its injured residents," id. ¶ 8(5)).

added).  As to the second element, although under the traditional formulation of trespass "any invasion[,] regardless of how insignificant[, would] constitute[] a trespass," in modern jurisprudence this historic principle has been "pragmatically modified" in light of "an increasing number of trespass claims [being] brought based on invisible, microscopic invasions of toxins or contaminants."  Id. at 15.  Indeed, most courts, including those of the District of Columbia, require a plaintiff alleging trespass based on particle deposits, such as the pesticide usage alleged here,  to "prove actual harm to the property."  Id. (noting that the standard has "similar dimensions of nuisance law," i.e. "requiring an actual showing of harm or interference with land"); accord John Larkin, Inc. v. Marceau, 959 A.2d 551, 554-555 (Vt. 2008) (discussing development of "modern" trespass theory, and adopting requirement of physical damage to property); see also Satterfield v. J.M. Huber Corp., 888 F. Supp. 1567, 1572 (N.D. Ga. 1995); Maddy v. Vulcan Materials Co., 737 F. Supp. 1528, 1539 (D. Kan. 1990).

Here, the plaintiffs having failed to adequately plead either of the two prongs of the tort of trespass, they cannot maintain their claim for trespass.  The plaintiffs' theory of trespass is explicitly premised on the assertion that the act resulting in the trespass was the "excessive and unlawful spraying of Mancozeb," which contaminated the plaintiffs' land with a toxic chemical. Am. Compl. ¶¶ 380-83.  Thus, in order to state a claim for trespass under this theory based on direct liability, the plaintiffs were required to allege that CropLife A or CropLife I intentionally sprayed Mancozeb and, that as a "immediate or inevitable consequence" of these acts, actionable claims of trespass were committed.  See Nat'l Tel., 38 F. Supp. 2d at 12.  In this case, the plaintiffs only generally state that the "defendants" acted in an "intentional" manner in spraying Mancozeb. Am. Compl. ¶ 382.  To the extent that this allegation concerns the CropLife Defendants, it is merely a recital of an element of the cause of action pled without any factual

support, as nowhere in the amended complaint do the plaintiffs allege, or even remotely suggest, that the CropLife Defendants ever personally sprayed Mancozeb in Ecuador (or, for that matter, anywhere else).  See generally Am. Compl.  To the contrary, to the extend that the amended complaint alleges that the CropLife Defendants had any role in any purported scheme involving Mancozeb, it was in the capacity of promoting or lobbying for its legality to facilitate its use by other entities.  See, e.g., Am. Compl. ¶¶ 3, 303.  For this reason, the plaintiffs cannot establish the first element of their trespass claim – "an intentional intrusion of a . . . thing upon property," Daily, 830 F. Supp. at 2 – in regards to the CropLife Defendants.  See Dine v. W. Exterminating Co., No. 86-CV-1857, 1988 WL 25511, at *9 (D.D.C. Mar. 9, 1988) (finding defendant did not commit an act of trespass by selling pesticide to a third party, who, in turn, applied it to plaintiff's land, because the defendant did not "directly cause[] a physical invasion of [the] plaintiff's" land) (emphasis added).

Moreover, the plaintiffs do not adequately allege actual harm to their land, having neglected to provide any factual support for the conclusory assertions that the plaintiffs' property is now "contaminat[ed] . . . with a toxic chemical," Am. Compl. ¶ 381, and that the plaintiffs' "use and enjoyment" of the property has been "substantial[ly and] unreasonabl[y] interfere[d]" with, id. ¶ 392.  The Supreme Court has made clear that "[t]hreadbare recitals of the elements of a cause of action . . . do not suffice," Iqbal, 129 S. Ct. at 1949, and the allegation here, lacking in any actual factual assertions, is similarly insufficient to support the plaintiffs' trespass claim.[14]

---

[14]	Because the CropLife Defendants argue in their motion to dismiss that the trespass claim should be dismissed in its entirety for failure to state a claim, Defs.' Mem. at 17-19, and the plaintiffs do not address this argument in their opposition beyond asserting theories of vicarious liability, see generally Pls.' Opp'n, this failure yet again would also warrant the Court finding that the plaintiffs have conceded the dismissal of their trespass claim based on the CropLife Defendants' direct liability for their alleged injuries.

## 2. The Plaintiffs' Claim for Fraud (Count III)

Regardless of which theory of fraud liability the plaintiffs are alleging, they have not plead, inter alia, the claim with the requisite level of particularity mandated by Federal Rule of Civil Procedure 9(b), and the Court is thus required to grant the CropLife Defendants' motion to dismiss this claim.

### a. The Fraudulent Concealment Doctrine

In their amended complaint, the plaintiffs allege that the defendants "fraudulently concealed the risks of Mancozeb" with knowledge that their representations would be "relied upon" by the plaintiffs, and because the plaintiffs did "rel[y] upon [the defendants'] representations and adjust[ed] their use of these chemicals" based on those representations, the defendants are liable for "fraudulent concealment." Am. Compl. ¶¶ 368-69 (emphasis added). The CropLife Defendants respond that the plaintiffs' fraudulent concealment claim should be dismissed because it is not an actionable theory of liability under the law of the District of Columbia. Defs.' Mem. at 11. The CropLife Defendants are correct in that the plaintiffs cannot maintain a claim under this theory of liability.

Fraudulent concealment is an equitable doctrine employed to "toll[] the running of [an applicable] statue of limitations" where a defendant is alleged to have improperly concealed the existence of a cause of action. See William J. Davis, Inc. v. Young, 412 A.2d 1187, 1191 (D.C. 1980) (noting that to invoke the doctrine of fraudulent concealment "the defendant must have done something of an affirmative nature designed to prevent discovery of the cause of action"); see also Firestone, 76 F.3d at 1209; Richards v. Mileski, 662 F.2d 65, 70 (D.C. Cir. 1981) (noting that "[u]nder the law of the District of Columbia, fraudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the

plaintiff"). Thus, because no allegations related to any applicable statutes of limitations have been raised by the plaintiffs, it is evident that their claim for "fraudulent concealment" must be dismissed for this reason alone.[15] Firestone, 76 F.3d at 1211 ("Parties pleading fraudulent concealment 'must plead with particularity the facts giving rise to the fraudulent concealment claim and must establish that they used due diligence in trying to uncover the facts.'" (citation omitted)).

      **b.     The Plaintiffs' Compliance with the Particularity Requirement Mandated by Rule 9(b)**

      Considering the Court's obligation to liberally construe the plaintiffs' amended complaint when challenged by a motion to dismiss, the Court assumes that the plaintiffs must have intended to assert a claim for fraudulent misrepresentation, a form of fraud, see Pls.' Opp'n at 20 n.12 (stating that the "[p]laintiffs' allegations would also state a claim for fraudulent misrepresentation"); see also Am Compl. ¶ 368 (alleging that the defendants "intentionally misrepresented . . . the risks of Mancozeb," knowing "that the representations made were false and that the undisclosed risks were material" (emphasis added)), instead of a statute of limitations related doctrine given that their allegations appear tailored to a claim for fraud and contain no assertion regarding any applicable statute of limitations. The defendants also recognized this possibility and contend that even if pleading a fraudulent misrepresentation claim

---

[15]     Even if a statute of limitation issue were to arise, the plaintiffs have failed to adequately plead a fraudulent concealment claim, which requires that they allege that the defendants made an "affirmative misrepresentation tending to prevent discovery of the wrongdoing." Firestone, 76 F.3d at 1209. The plaintiffs arguably allege a number of wrongdoings, but fail to suggest any act by which the CropLife Defendants attempted to cover them up. See generally Am. Compl. Moreover, considering that Federal Rule of Civil Procedure 9(b) also applies to a claim of fraudulent concealment and requires that such claims be pled with specificity, for the reason set forth in more detail below, the plaintiffs would have fallen far short of adequately legitimizing application of the fraudulent concealment doctrine under District of Columbia law. See Firestone, 76 F.3d at 1211 ("Parties pleading fraudulent concealment 'must plead with particularity the facts given rise to the fraudulent concealment.'" (citation omitted)).

was intended, it also does not survive their motion to dismiss "because [the p]laintiffs have failed to plead the cause of action with the specificity required by" Rule 9(b).[16] Defs.' Mem. at 11.

Under District of Columbia law, an allegation of fraud must include the following essential elements: "(1) a false representation, (2) concerning a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) upon which reliance is placed." In re Estate of McKenney, 953 A.2d 336, 341 (D.C. 2008). A complaint alleging fraud must also "meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure," Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc., 525 F.3d 8, 22 (D.C. Cir. 2008), which requires that "the circumstances constituting fraud . . . [be] stated[ed] with particularity," Fed. R. Civ. P. Rule 9(b). In this Circuit, "the circumstances that the claimant must plead with particularity include matters such as the time, place, and content of the false misrepresentations, the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fraud." Chelsea Condo. Unit Owners Ass'n v. 1815 A. St., Condo. Group, LLC, 468 F. Supp. 2d 136, 146 (D.D.C. 2007); see United States ex rel. Williams v. Martin-Baker Aircraft Co., 389 F.3d 1251, 1256 (D.C. Cir. 2004) (noting that Rule 9(b) requires a complaint to set forth the "time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud" as well as to "identify[ing the] individuals allegedly involved in the fraud" (citations omitted)). "Unless . . . a complaint . . . pleads with particularity [a] defendant's alleged fraudulent representations . . . [,the plaintiff] will not be permitted to" maintain the claim. United States ex rel. Fisher v. Network Software Assocs., 227 F.R.D. 4,

---

[16]    The CropLife Defendants characterize the plaintiffs' amended complaint as alleging "certain elements of fraud against CropLife Ecuador," but not directly against CropLife A or CropLife I, Defs.' Mem. at 12, and as a result concentrate their arguments on the alleged fraudulent behavior of CropLife Ecuador, id. at 12-13. Although the fraudulent activities of CropLife Ecuador are relevant to the plaintiffs' vicarious liability position, the plaintiffs also seek to impose principal liability on CropLife A or CropLife I regardless of the liability of CropLife Ecuador. Am. Compl. ¶ 368.

11 (D.D.C. 2005).  This requirement is imposed because to permit a fraud claim to go forth on less specific allegations would permit "'the discovery of unknown wrongs,' which Rule 9(b) seeks to prevent."  Id. (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1279 n. 3 (D.C. Cir. 1994)).  Accordingly, Rule 9(b) both "discourages the initiation of suits brought solely for their nuisance value" and "guarantee[s] all defendants sufficient information to allow for preparation of a response."  Williams, 389 F.3d at 1256 (citations and alterations omitted).

Upon review of the plaintiffs' amended complaint, the Court concludes for several reasons that their allegations of fraud do not satisfy the heightened pleading requirements of Rule 9(b).  First, the amended complaint fails to adequately identify with specificity the defendants responsible for allegedly fraudulently misrepresenting the dangers of Mancozeb.  See Bates v. Nw. Human Servs., Inc., 466 F. Supp. 2d 69, 92 (D.D.C. 2006) (concluding that "[r]equiring the [various] defendants to guess amongst themselves which one is responsible for the instances of . . . fraud alleged by the plaintiffs is surely not in keeping with the purposes of Rule 9(b)").  The plaintiffs generally assert that all the defendants knowingly misrepresented the dangers of Mancozeb, but they fail to provide any indication of the role played by the individual defendants or distinguish the specific acts of fraudulent activity allegedly committed by the CropLife defendants.  See generally Am. Compl. ¶¶ 367-370; Bates 466 F. Supp. 2d at 90 (characterizing pleading with a similar deficiency as being "utterly unhelpful in discerning the meat of the plaintiffs' allegations" and finding that "[t]he plaintiffs' unmitigated vagueness regarding which defendant played which role in the fraudulent conduct is surely inconsistent with the heightened pleading requirement of Rule 9(b)").  This omission is especially problematic here given that the amended complaint implicates more than a dozen defendants who are group by the plaintiffs into four distinct classes that allegedly engaged in three types of activities which purportedly caused

the plaintiffs' injuries.  <u>See</u> Am. Compl. ¶¶ 303-44.  Such imprecise pleading not only "fail[s] to give the [CropLife Defendants] sufficient information to answer the [amended] complaint, but it also subject[s them] to vague, potentially damaging accusations of fraud," precisely what Rule 9(b) seeks to prevent.  <u>See</u> <u>Williams</u>, 389 F.3d at 1257.

Further, the plaintiffs do not adequately "specify what [fraudulent] statements were made [by the CropLife Defendants] and in what context."  <u>Intex Recreation Corp. v. Team Worldwide Corp.</u>, 390 F. Supp. 2d 21, 24 (D.D.C. 2005).  Although plaintiffs need not "allege every fact pertaining to every instance of fraud . . . , defendants must be able to defend against the charge and not just deny that they have done anything wrong," <u>Williams</u>, 389 F.3d at 1259 (citation and quotation marks omitted).  Here, the plaintiffs offer virtually no facts pertaining to any alleged fraudulent misrepresentations, beyond the generalized allegations that all the defendants knew of the "human health hazards associated with Mancozeb, yet concealed these risks from [the p]laintiffs." Am. Compl. ¶ 370.  Such generalized claims fail to adequately describe the fraudulent conduct the defendants are being charged with committing or explain "the role [that any of the] individual[] [defendants] played in the alleged fraud."  <u>Williams</u>, 389 F.3d at 1259.  Moreover, the plaintiffs allege an "open-ended time span" as to when the fraud occurred, <u>id.</u> at 1257, asserting only that it was "particularly after 2005" when the defendants allegedly "provided [the] false and misleading information," Am. Compl. ¶ 5; <u>see also</u> <u>id.</u> ¶¶ 368-70.  This "fail[s] to give the [CropLife Defendants] sufficient information to allow for preparation of a response" with an appreciation of when these alleged fraudulent misrepresentation may have occurred, and such an open-ended timeframe of several years fails to properly narrow the

allegations to a timeframe with sufficient specificity as required by Rule 9(b).  <u>Williams</u>, 389

F.3d at 1257 (citation and quotation marks omitted).[17]

### c.    The Exceptions to the Requirements of Rule 9(b)

Arguing in the alternative, the plaintiffs posit that should the Court find that the plaintiffs'

fraudulent misrepresentation allegations do not satisfy the requirements Rule 9(b), the plaintiffs

are entitled to rely upon an exception to the pleading requirement imposed by that Rule due to

their lack of access to the information upon which their claim is based.  Pls.' Opp'n at 21.  They

predicate this position on the fact that the CropLife Defendants' "internal documents are . . . not

publicly available," and therefore, "there [was] simply no means of providing accurate and

specific information regarding dates and times" of the alleged fraudulent misrepresentations.  <u>Id.</u>

And "where the precise details are in the exclusive control of the defendant," the plaintiffs opine

that "an exception to pleading fraud with specificity exists."  <u>Id.</u>[18]

The plaintiffs are correct that a court, in its discretion, may find that pleadings based on

"information and belief," as opposed to being based on factual allegations, may be sufficient

where it can be shown that "'the necessary information lies within the defendants' control.'"

<u>Kowal v. MCI Commc'ns Corp.</u>, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994) (citation omitted);

<u>Williams</u>, 389 F.3d at 1258 (noting that "this circuit provides an avenue for plaintiffs unable to

meet the particularity standard because defendants control the relevant documents-plaintiffs in

---

[17]    The plaintiffs' argument that their failure to plead fraud with more specificity should be excused considering the pre-discovery stage of the litigation is unavailing, as it does not take into account the "justification for a strict pleading standard under Rule 9(b), which is to avoid 'the discovery of unknown wrongs.'"  <u>In re Newbridge Networks Sec. Litig.</u>, 926 F. Supp. 1163, 1173 (D.D.C. 1996) (noting that regardless of the stage of litigation, a plaintiff "must, in order to satisfy Rule 9(b), either allege additional facts or allege that such facts are within defendants' control and provide a statement of facts on which the allegations are based").

[18]    Although the plaintiffs have a good faith basis for raising the lack of access doctrine, none of the cases cited to by them substantiate their position.  Indeed, the cases cited involve allegations of fraudulent concealment and not fraudulent misrepresentation.  <u>See</u> Pls.' Opp'n at 21-22.

such straits may allege lack of access in the complaint").  This exception, however, still must be "construed consistent with the purposes of Rule 9(b)," i.e. it is not intended to allow "the filing of a complaint as a pretext [used to] discover[] unknown wrongs."  Kowal, 16 F.3d at 1279 n.3.  Accordingly, the doctrine is only available to a plaintiff when the information needed to make factual allegations is "peculiarly within the knowledge of the opposing party," Kowal v. MCI Commc'ns Corp., No. 90-CV-2862, 1992 WL 121378, at *6 (D.D.C. May 20, 1992) (emphasis added), and in order to invoke the doctrine a plaintiff is required to make "an allegation that the necessary information lies within the defendant's control, and . . . such allegations must also be accompanied by a statement of the facts upon which the allegations are based," Kowal, 16 F.3d at 1279 n.3.

Here, the plaintiffs first raise the doctrine of lack of access in their opposition to the defendants' motion, never relying on this exception in their amended complaint.  See generally Compl.; Pls.' Opp'n at 21-22.  To the extent the plaintiffs can provide factual support for their position that the information necessary for them to support a claim of fraudulent concealment is particularly within the CropLife Defendants' control, then the plaintiffs are required to "so state[,] and [also] identify the facts upon which [this] allegation is founded."  See In re Newbridge Networks Sec. Litig., 926 F. Supp. 1163, 1173 (D.D.C. 1996).  Absent the requisite "statement of the facts upon which the allegations [of denial of access] are based," the plaintiffs have not adequately pled facts upon which the Court would be justified in concluding that their lack of access has prevented them from sufficiently alleging factual support for a fraudulent misrepresentation claim.  Kowal, 16 F.3d at 1279 n.3 (citations omitted).

### 4.       The Plaintiffs' Claim for Negligent Supervision (Count V)

The plaintiffs seek to hold the CropLife Defendants liable under the theory of negligent supervision, asserting that these defendants "had the authority to supervise, prohibit, control, and/or regulate the application standards for Mancozeb," could have prevented Mancozeb from being used, and knew that in not preventing its utilization the plaintiffs would "suffer the injuries described [in the Complaint]."  Am. Compl. ¶¶ 377-78.  And because the defendants allegedly failed to exercise due care in "supervise[ing], prohibit[ing], control[ing] or regulat[ing] their employees and/or agents," or in "mak[ing any] appropriate investigations into the possible negative impact on the" plaintiffs, the CropLife Defendants are liable for the injuries they allegedly sustained.  Id. ¶ 379.  The CropLife Defendants respond that not only have the plaintiffs failed to state a claim of negligent supervision because they fail to allege "that any [CropLife A] or [CropLife I] employees were ever present in Ecuador," but that they have also failed to allege that "employees [of the CropLife Defendants] behaved in a dangerous or incompetent manner and that [the CropLife Defendants] failed to adequately supervise them." Defs.' Mem. at 16.

In order to state a claim for negligent supervision, the plaintiffs must plead that: "(1) [the defendants'] employees behaved in an incompetent manner; (2) [the defendants] had actual or constructive knowledge of this incompetent behavior; and (3) despite having this actual or constructive knowledge, [the defendants] failed to adequately supervise [their] employees."[19]

---

[19]       As the parties correctly acknowledge in their submissions regarding the CropLife Defendant's motion, the case law in the District of Columbia is ambiguous as to whether in a negligent supervision action the dangerous or incompetent behavior must have been committed by an employee or agent of the defendant.  In Giles v. Shell Oil Corp., 487 A.2d 610, 613 (D.C. 1985), the District of Columbia Court of Appeals found the employee requirement determinative, dismissing the plaintiff's claim upon finding that the injurious behavior was not carried out by an employee or agent of the defendants.  Subsequently, however, that same Court in Brown v. Argenbright Sec., Inc., 782 A.2d 752, 760 n.11 (D.C. 2001) , noted (in a footnote) that "[a]lthough Giles and other cases discuss negligent supervision in the context of an employer-employee relationship . . . , it is clear from the Restatement and other

(continued . . . )

Mitchell v. DCX, Inc., 274 F. Supp. 2d 33, 51 (D.D.C. 2003). And, as a threshold matter, a party alleging negligent supervision must also identify the individual over whom the defendant had a duty to supervise, such that the failure to properly exercise this duty would give rise to a negligent supervision claim by the plaintiff. See Brown, 782 A.2d at 760 (indicating that a plaintiff must establish the defendant's knowledge of an employee's behavior under a negligent supervision theory).

Here, it is unclear from the plaintiffs' amended complaint who it was that the CropLife Defendants failed to adequately supervise, see generally Am. Compl. ¶¶ 374-79 (vaguely stating that all the defendants failed to supervise their "employees and/or agents"), but even if the plaintiffs had identified any such individual, the remainder of their negligent supervision allegations lack the requisite factual basis necessary for them to maintain their claim on this theory, see Pls.' Opp'n at 18-19. The plaintiffs acknowledge that to "state a claim for negligent supervision" they must first "show that [the CropLife Defendants] knew or should have known that their agents, contractors, or employees behaved in a dangerous or otherwise incompetent manner." Id. at 19. The plaintiffs first suggest that the CropLife Defendants can be held liable for the "negligent supervision of [CropLife Ecuador]," a defendant located in Ecuador, but the

---

(. . . continued)
authorities that a claim of negligent supervision does not require proof that the supervised person was also an employee or agent." Despite this observation by the Brown Court, being another panel opinion of the court it could not overturn Giles, Hartridge v. United States, 892 A.2d 198, 224 (D.C. 2006); Bldg & Constr. Trades Dep't, AFL-CIO v. Allbaugh, 295 F.3d 28, 34 n.1 (D.C. Cir. 2002) (indicating that a "panel [of the Court] is bound to abide by . . . precedent unless it is overturned by the court sitting en banc or by the Supreme Court"), and in any event the comment about Giles was made in dicta, as the court held for the defendant on other grounds, rendering the employee distinction irrelevant. Thus, the Giles principle continues to be cited as controlling precedent. See, e.g., Godfrey v. Iverson, 559 F.3d 569, 571 (D.C. Cir. 2009) ("Liability for negligent supervision arises when an 'employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee'"). Because the Court finds that the plaintiffs have failed to allege that the CropLife Defendants improperly supervised any individual or violated a duty of care owed to the plaintiffs, the Court need not address whether the principle announced in Giles remains controlling authority in this jurisdiction.

plaintiffs do not also allege that CropLife Ecuador was either of the CropLife Defendants' contractor or employee. <u>Id.</u> The Court must presume then that the plaintiffs' allegation is premised on the theory that CropLife Ecuador is the agent of the CropLife Defendants, but, as addressed below, the plaintiffs fail to adequately allege facts that would establish the existence of an agency relationship with either defendant. Thus, the plaintiffs have not adequately alleged that the CropLife Defendants had a duty to supervise anyone who allegedly caused the plaintiffs' injury, including CropLife Ecuador.

The plaintiffs also contend that the CropLife Defendants can be held liable for the negligent supervision of "any other CropLife employee or contractor, who . . . misleadingly promoted the use of Mancozeb," Pls.' Opp'n at 19; however, such a "scant factual allegation" fails to satisfy the pleading requirements of the Federal Rules of Civil Procedure because it does not provide the defendants with sufficient specificity to accord them the ability to properly defend themselves, <u>Bryant v. U.S. Gov't</u>, 527 F. Supp. 2d 137, 142 (D.D.C. 2007); <u>see also</u> <u>Twombly</u>, 550 U.S. at 555 (reiterating that the complaint must contain a "'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'"). Accordingly, the Court must dismiss the plaintiffs' negligent supervision claim lodged against the CropLife Defendants.

**5.    The Plaintiffs' Claim for Public Nuisance, Private Nuisance and Nuisance <u>Per Se</u> (Count VIII)**

**a.    The Plaintiffs Have Failed to Adequately Allege Any Right Common to the General Public which the CropLife Defendants Interfered With**

The Resident and Municipality plaintiffs assert that the defendants sprayed "excessive and unlawful amounts of Mancozeb on the property of the Resident Plaintiffs and the Municipality,"

resulting in the "contamination of plaintiffs' lands with a toxic chemical," Am. Compl. ¶¶ 389-90, that has "caused[,] and continues to cause, substantial and unreasonable interference with the use and enjoyment of the properties owned or occupied by the Resident . . . and the Municipality" plaintiffs,[20] id. ¶ 391. The CropLife Defendants respond that the plaintiffs do not state "a claim for public nuisance because they have failed to allege they have suffered an unreasonable interference with a right common to the general public."[21] Defs.' Mem. at 20.

In the District of Columbia, "'a public nuisance is an unreasonable interference with a right common to the general public.'" Nat'l Tel., 38 F. Supp. 2d at 13 (quoting B & W Mgmt., Inc. v. Tasea Inv. Co., 451 A.2d 879, 881 (D.C. 1982)). A plaintiff bringing such a claim must at minimum identify a violation of some common public right, i.e. "damage to property, damage to human health, or damage to anything remotely approximating a 'right common to the general public.'" See id.; see also B & W Mgmt., 451 A.2d at 881 (noting that public nuisance claims also traditionally covered "a variety of minor criminal offenses that interfered, for example, with the public health, safety, morals, peace, or convenience"); Tucci v. District of Columbia, 956

---

[20] The CropLife Defendants assert generally that all of the plaintiffs' nuisance claims are deficient because the plaintiffs "do not allege that [CropLife A] or [CropLife I] ha[d] the power to abate the alleged nuisance" and as such "have failed to state a claim against [CropLife A] or [CropLife I] under any of their nuisance theories." Defs.' Mem. at 20. This argument must be rejected. The only relevant authority the CropLife Defendants offer in support of this contention is an unreported case from 1988, which states in dicta that an "essential element" of a nuisance claim is the "power to abate the nuisance." See Dine, 1988 WL 25511 at *9. Upon review of the Dine opinion, the Court's imposition of the power to abate requirement is derived from the decision of a federal district court in Rhode Island, which in imposing such a requirement was applying New Hampshire state law. See City of Manchester v. Nat'l Gypsum Co., 637 F. Supp. 646, 656 (D.R.I. 1986). Given that New Hampshire state law is not relevant here, and the CropLife Defendants offer no other authority for the proposition that a showing of the power to abate a nuisance is required at the pleading stage (and the Court is unable to otherwise locate any authority through its own diligence), the Court will not dismiss the nuisance claims on this ground alone.

[21] The CropLife Defendants also argue that the plaintiffs lack standing to bring a public nuisance claim. See Defs.' Mem. at 20. While generally only "governmental authorities or other representatives of the general public have standing to attack a public nuisance in court" (although private parties may bring such a claim if they "can allege and prove 'special damages, distinct from that common to the public'"), Nat'l Tel., 38 F. Supp. 2d at 13, here, the plaintiffs bring the nuisance claim, at least in part, on behalf of the Municipality of Pueblo Viejo, Am. Compl. at 150 ("Eighth Cause of Action"). The Court will therefore presume at this stage that the governmental representative requirement of the tort is satisfied, at least with respect to the claim brought on behalf of the municipal plaintiff.

A.2d 684, 696 n.11 (D.C. 2008) (noting that "some examples of public nuisances include storing explosives in the middle of a city or maintaining a pond in which malarial mosquitoes are breeding"). If a plaintiff fails to allege interference with a common public right, a court is justified in dismissing a case for failure to state a claim. See Nat'l Tel., 38 F. Supp. 2d at 13-14 (dismissing plaintiff's public nuisance claim when the only interference alleged by the plaintiff was diminution in market value of its property, which the court found to be an "insular claim . . . [that] touches upon no right common to the general public") (citation omitted).

Here, the plaintiffs merely recite the elements of a public nuisance claim without providing any factual support for the allegation that a right common to the general public has been harmed, rendering the claim deficient. See Am. Compl. ¶¶ 388-94. The plaintiffs' bare assertion that the defendants caused "interference with the use and enjoyment of the properties owned or occupied by the Resident Plaintiffs and the Municipality," Am. Compl. ¶ 391, is precisely the type of "scant factual allegation[] [that] fail[s] to satisfy the notice pleading requirements because [it] do[es] not put [the] defendant[s] on notice" as to the specific nature of the claim being asserted, see Bryant, 527 F. Supp. 2d at 142. The CropLife Defendants having correctly alleged that the plaintiffs have not asserted any right common to the general public that was unreasonably interfered with, the plaintiffs' public nuisance claim against the CropLife Defendants must be dismissed.[22]

---

[22]    The plaintiffs provide no factual support in their amended complaint to support their position that the CropLife Defendants caused an "unreasonable interference." See generally Am. Compl. 388-94 (merely stating that the defendants caused an "unreasonable interference" with no factual indication of how and to what extent). The Supreme Court has made clear that nakedly stating the elements of a cause of action in a complaint will not suffice; thus, a plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." See Iqbal, 129 S. Ct. at 1949. Here, the plaintiffs fail to adequately plead either the specific common public right that has allegedly been interfered with, and the extent of that interference; accordingly, the plaintiffs have also failed to allege a public nuisance claim against the CropLife Defendants. See Nat'l Tel., 38 F. Supp. 2d at 13-14. Moreover, the District of Columbia Court of Appeals recently reaffirmed a more stringent pleading standard for public nuisance claims, refusing to "loosen" the tort from its "traditional moorings" and requiring plaintiffs to plead
(continued . . . )

### b. The Plaintiffs Have Failed to Adequately Allege that the CropLife Defendants are Neighboring Landowners

The plaintiffs are pursing their private nuisance claim based on their status as residents of Ecuador and an Ecuadorian municipality. Am. Compl. ¶¶ 384-94. The CropLife Defendants argue that the plaintiffs cannot maintain their private nuisance claim against them because "only an adjacent property owner may bring an action for [a private] nuisance," and the plaintiffs "do not allege that [CropLife A] or [CropLife I] is a neighbor to any [of the plaintiffs]." Defs.' Mem. at 21-22. For the following reasons, the CropLife Defendants have the stronger position.

Distinct from a public nuisance claim, a private nuisance claim "is a substantial and unreasonable interference with private use and enjoyment of one's land . . . [,]for example, by interfering with the physical condition of the land, disturbing the comfort of its occupants, or threatening future injury or disturbance." B & W Mgmt., 451 A.2d at 882.[23] In other words, "[a] private nuisance is a non-trespassory invasion of another's interest in the private use and enjoyment of land." Carrigan v. Purkhiser, 466 A.2d 1243 (D.C. 1983) (quoting Restatement (Second) of Torts § 821D (1979)). Thus, "[u]nlike a trespass, which is an 'invasion of the interest in the exclusive possession of land,' a private nuisance is 'an interference with the interest in the private use and enjoyment of land, and does not require interference with the possession.'" Id. (quoting Restatement (Second) of Torts § 821D). Since the plaintiffs have not alleged that the CropLife Defendants have any physical presence in Ecuador, it is difficult to discern how it

---

(. . . continued)
"duty, proximate causation, [and] foreseeability" in order to state a public nuisance claim. See District of Columbia v. Beretta, U.S.A., Corp., 872 A.2d 633, 646 (D.C. 2005). The plaintiffs have failed to plead any of these elements, and the claim must be dismissed for these failings also.

[23]     A nuisance claim is commonly distinguished from a trespass claim, as it is considered a "nontrespassory invasion." Carrigan v. Purkhiser, 466 A.2d 1243, 1243-44 (D.C. 1983). Despite the difference between the two theories, a plaintiff can at times successfully pursue both claims because "[i]n some instances, of course, a person's conduct may give rise to both a claim of trespass and a claim of nuisance." Id. at 1244 n.2.

is that anything the CropLife Defendants did created the requisite "nontrespassory invasion." Carrigan v. Purkhiser, 466 A.2d 1243, 1243 (D.C. 1983); see also Tucci v. District of Columbia, 956 A.2d 684, 699 n.14 (D.C. 2008) (requiring evidence that the defendant "create[d] or maintain[ed] the alleged nuisance" in order to establish nuisance liability); Daily, 930 F. Supp. at 2 (granting defendant summary judgment on nuisance claim on grounds that the plaintiff and the defendant were not adjacent land owners) (citing Rosenblatt v. Exxon Co., U.S.A., 642 A.2d 180 (Md. 1994)). Moreover, although "[t]he D.C. cases neither hold nor state that a nuisance claim must arise between neighboring occupiers of property," it appears that the claim of nuisance has only been found actionable where "a nuisance . . . originate[s] from a neighbor's property." Daily, 930 F. Supp. at 2 (relying on Maryland common law when D.C. common law was not decisive as to whether parties must be neighboring landowners where nuisance claim was asserted and determining that adjacent land ownership is required). Thus, at minimum, the plaintiffs must allege that the CropLife defendants have some physical presence in Ecuador, or the constructive equivalent of such presence through others[24] from which it could be found that the CropLife defendants interfered with the plaintiffs' land. Cf. Wood v. Neuman, 979 A.2d 64, 78 (D.C. 2009) ("To be actionable as a nuisance, the offending thing must be marked by 'some degree of permanence' such that the 'continuousness or recurrence of the things, facts, or acts which constitute the nuisance,' give rise to an 'unreasonable use.'" (emphasis added)). Because there is no allegation here that either of the CropLife Defendants own or control land in Ecuador adjacent to any of the plaintiffs' land, or engaged in any activity in Ecuador, either directly or

---

[24]     For the reasons set forth elsewhere in this Memorandum Opinion, the Court finds that the plaintiffs have failed to demonstrate any controlling relationship between the CropLife Defendants and any entity or individual in Ecuador.

through their agents that created the alleged nuisance, the plaintiffs cannot maintain their private

nuisance claim against them.[25]

   c.    **The Plaintiffs Have Failed to Adequately Allege that the Use of Mancozeb Constitutes Nuisance <u>Per Se</u>**

The plaintiffs, who as noted are pursing their nuisance claims based on their status as

residents of Ecuador and an Ecuadorian municipality, also argue that "[r]egardless of whether

[the d]efendants' conduct creates a common law nuisance," the defendants are nonetheless liable

for nuisance <u>per se</u>, because their acts were in "violation of the standards of care set forth in

various laws of the United States, Ecuador, the District of Columbia, the law of nations, and

agreed and common industry standards and practices."[26] Am. Compl. ¶ 393. The CropLife

Defendants respond that the plaintiffs have failed to state a nuisance <u>per se</u> claim because their

amended complaint does not allege "that the use of the fungicide [M]ancozeb is an activity

which is a nuisance at all times and under any circumstances." Defs.' Mem. at 23. To the

contrary, the CropLife Defendants opine that the plaintiffs have implicitly acknowledged that

Mancozeb is not a nuisance <u>per se</u> by admitting that Mancozeb only constitutes a nuisance

"when it is sprayed in 'excessive and unlawful amounts.'" <u>Id.</u> (quoting Am. Compl. ¶ 389).

A principle that has application in both the civil and criminal context, nuisance <u>per se</u> is

defined as "a structure or activity which is a nuisance at all times and under any circumstances."

<u>Harris v. United States</u>, 315 A.2d 569, 572 n.9 (D.C. 1974). Once a plaintiff has provided proof

---

[25]    Alternatively, this claim fails for the same reasons that the public nuisance claim must be dismissed, i.e., the plaintiffs' amended complaint merely recites conclusory allegations that the defendants "substantial[y] and unreasonabl[y] interfer[ed] with the [plaintiffs'] use and enjoyment" of their land, Am. Compl. ¶ 391, without the necessary factual support to maintain the claim. Absent more detailed allegations, the defendants are not on notice of what use or enjoyment of the plaintiffs' land has been violated or how the interference substantially interfered with the plaintiffs' enjoyment of their property. <u>See Iqbal</u>, 129 S. Ct. at 1949.

[26]    As stated above, the Court will not consider the laws of Ecuador as the plaintiffs have not specifically identified for the Court the applicable laws of that country.

of such an "act or the existence of [such a] structure," the tort of nuisance has been established "as a matter of law." Id. Here, the plaintiffs fall far short of stating a claim for nuisance per se.

Contrary to the plaintiffs' interpretation of the case law, Pls.' Opp'n at 23-24, nuisance per se does not necessarily arise every time a law is violated, see Tucci, 956 A.2d at 697 n.13 (finding that "violations of local ordinances do not translate into . . . [nuisance] per se under the common law"); B & W Mgmt., 451 A.2d at 882 n.7 (noting that "[a] zoning violation does not constitute a 'nuisance per se'"). Moreover, in attempting to plead a claim for nuisance per se solely on the grounds that a statutory standard of care was violated, the plaintiffs have failed to set forth the correct standard for nuisance per se, see Am. Compl. ¶ 393, i.e., that the defendants' activities constitute "a nuisance at all times and under any circumstances," Tucci, 956 A.2d at 697 n.13. Indeed, as the CropLife Defendants correctly note, the plaintiffs argue that it was only the defendants' "improper discharge, release, and spraying of a toxic chemical" that resulted in the purported nuisance, Am. Compl. ¶ 392 clearly implying that the spraying of Mancozeb is not a nuisance under all circumstances. (emphasis added); see Defs.' Mem. at 23. Thus, the plaintiffs have not alleged the requisite facts to support a claim for nuisance per se, and accordingly, the claim must be dismissed as requested by the CropLife Defendants.

      **6.**      **The Plaintiffs' Strict Liability Claim (Count IX)**

Finally, the plaintiffs attempt to impose strict liability on the CropLife Defendants on the grounds that the "handling, use, storage, disposal and/or spraying of . . . Mancozeb[] constitutes an ultra hazardous and/or abnormally dangerous activity." Am. Compl. ¶ 396. And the plaintiffs theorize that because "[a]s a direct and proximate result of such activity . . . the [p]laintiffs have suffered damages[,] . . . [the d]efendants are strictly liable for these damages." Id. ¶ 398. The CropLife Defendants respond that although the plaintiffs allege that the "handling, use, storage,

disposal and/or spraying of" Mancozeb is an abnormally dangerous activity "for which strict

liability should be imposed," the plaintiffs fail to "allege that [CropLife A] or [CropLife I]

handle, use, store, dispose of, or spray [M]ancozeb," a required element of a strict liability claim.

Defs.' Mem. at 24 (citing Am. Compl. ¶ 396).[27]  Thus, the CropLife Defendants conclude that

the strict liability claim "must fail because [the] plaintiffs have not alleged that [CropLife A] or

[CropLife I] has conducted any abnormally dangerous activities."  Id. (emphasis added).  The

CropLife Defendants are correct that the plaintiffs have failed to state a claim for strict liability,

but the Court finds that the failure stems from the absence of any factual support for their

position that using Mancozeb is an abnormally dangerous activity, rather than their failure to

associate the CropLife Defendants with that activity.

The District of Columbia Court of Appeals has recognized the common law doctrine of

strict liability when a party is alleged to have engaged in abnormally dangerous activities, see

District of Columbia v. Beretta U.S.A., Corp., 940 A.2d 163, 171 n.5 (D.C. 2008) (citation

omitted), i.e. "activities that are dangerous in themselves and to injuries that result directly from

the dangerous activity,"[28] Delahanty v. Hinckley, 564 A.2d 758, 761 (D.C. 1989).  For example,

---

[27]     The CropLife Defendants also contend that the plaintiffs concede that Mancozeb is not abnormally hazardous.  Defs.' Mem. at 25 n.6; see, e.g., Am. Compl. ¶ 2 (suggesting that when used properly Mancozeb does not pose a threat to humans); id. ¶ 6 (noting that Mancozeb can be utilized at "safe levels").

[28]     Although general strict liability may be imposed either by statute or under the common law, see Moore v. Waller, 930 A.2d 176, 181 n.3 (D.C. 2007), here, the plaintiffs have not alleged that any District of Columbia statute would impose strict liability for the "handling, us[ing], stor[ing], dispo[ing] and/or spraying" Mancozeb, Am. Compl. ¶ 396, and thus the Court's analysis focuses on whether the plaintiffs have alleged a strict liability claim under common law.  To the extent that the plaintiffs seek to establish liability on the basis that the Environmental Protection Agency and other regulatory bodies have determined that Mancozeb poses known dangers to humans, Am. Compl. ¶¶ 6, 309, such a claim would be grounded in the law of products liability (as opposed to liability for abnormally dangerous activity), see Dine, 1988 WL 25511 at *8.  And an essential element of strict liability in the products liability context is that the "product was sold in a defective condition unreasonably dangerous to the consumer or user," Word v. Potomac Elec. Power Co., 742 A.2d 452, 459 (D.C. 1999), and because the plaintiffs have not made any such allegation here, see generally Am. Compl., they have also not stated a strict liability claim under products liability law.

the "prototypical" example of an abnormally dangerous activity is the "detonation of explosives," because it is regarded as "an activity that cannot be performed with absolute safety[,] regardless of the care exercised." <u>Dine</u>, 1988 WL 25511 at *8.

Unlike the detonation of explosives, the plaintiffs offer no allegations indicating why using Mancozeb constitutes an abnormally dangerous activity. Indeed, they simply recite the elements that are necessary to establish a cause of action for strict liability, i.e., the "handling, use, storage, disposal and/or spraying of . . . Mancozeb[] constitutes an ultra hazardous and/or abnormally dangerous activity." Am. Compl. ¶ 396. Without more, the plaintiffs' allegations do not "raise a right to relief above the speculative level," <u>Twombly</u>, 550 U.S. at 555-56, and thus their strict liability claim must be dismissed for that reason, <u>see</u> <u>Delahanty</u>, 564 A.2d at 761 (indicating that the activity must be one that is dangerous in and of itself); <u>see also</u> <u>Nat'l Tel.</u>, 38 F. Supp. 2d at 8 (finding the storing of gasoline not to be an abnormally dangerous activity, because "[u]nlike archetypical abnormally dangerous activities such as blasting, there is no evidence to suggest 'that [the dangers posed by the storage of gasoline] cannot be eliminated by the exercise of reasonable care'").[29]

## B.    The Plaintiffs' Theories of Vicarious Liability

The plaintiffs also allege vicarious liability on the part of the CropLife Defendants (i.e. liability based on the legal principles of aiding and abetting, agency, and conspiracy). In the District of Columbia, none of the three theories gives rise to an independent cause of action; rather, liability under each is reliant upon derivative tortious activity and therefore must be

---

[29]    Because the CropLife Defendants argue in their motion to dismiss that the strict liability claim should be dismissed for failure to state a claim upon which relief may be granted, Defs.' Mem. at 24-25, and the plaintiffs do not address this argument in their opposition, <u>see generally</u> Pls.' Opp'n, the Court finds that this omission is a basis to dismiss the claim for as well.

premised on some underlying tort.  See Ali v. Mid-Atl. Settlement Servs., Inc., 640 F. Supp. 2d

1, 9 (D.D.C. 2009) (granting the defendant summary judgment on the plaintiff's conspiracy and

aiding and abetting claims upon dismissal of underlying tort of fraud); Burnett v. Al Baraka Inv.

and Dev. Corp., 274 F. Supp. 2d 86, 105 (D.D.C. 2003) (noting that "[l]iability for aiding and

abetting, or for conspiracy, must be tied to a substantive cause of action").  As discussed above,

because the plaintiffs have failed to adequately state an actionable claim for any tortious activity

by the CropLife Defendants, the plaintiffs' vicarious liability theories cannot be maintained.

And even presuming for the sake of argument that the plaintiffs' had adequately alleged any

underlying tortious activity, their theories of vicarious liability still could not be maintained

against the CropLife Defendants.

### 1.    The Plaintiffs' Aiding and Abetting Theory

The plaintiffs allege that "[i]n accomplishing the objective of selling large quantities of

Mancozeb in Ecuador . . . all of the Defendants[, including the CropLife Defendants, ] . . . aided

and abetted" in actions that resulted in the plaintiffs' injuries.  Am. Compl. ¶ 359.  Although the

plaintiffs do not develop this theory of liability further in their amended complaint, in their

opposition to the CropLife Defendant's motion for dismissal, the plaintiffs clarify that the

underlying tortious activity upon which derivative liability is attached flows from their claims for

"assault, battery, trespass, nuisance, and strict liability."[30]  Pls.' Opp'n at 11.  The plaintiffs

---

[30]    In ruling on a Rule 12(b)(6) motion a court "may consider only the facts alleged in the complaint, any
documents either attached to or incorporated in the complaint and matters of which we may take judicial notice,"
EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997).  And while subsequent written
submissions do not afford the plaintiff the opportunity to "allege additional facts" necessary to defeat a motion to
dismiss, a plaintiff "may further 'develop his claim'" by "flesh[ing] out the legal arguments he sketched in his
complaint." Henthorn v. Dep't of Navy, 29 F.3d 682, 687-688 (D.C. Cir. 1994) (internal quotations and citation
omitted).  Thus, to the extent that the plaintiffs' opposition to the CropLife Defendants' motion does not allege new
factual material but rather helps to develop the plaintiffs' legal theories of liability, they may be properly considered
in ruling on the CropLife Defendants' motion to dismiss.  See id.

contend that the CropLife Defendants "knew about the toxicity of [M]ancozeb, and yet promoted its use [as safe]," and "provided substantial assistance to the Mancozeb Producer Defendants" in the commission of the underlying torts (1) "by lobbying to lift the absolute ban on Mancozeb;" (2) by "signing a cooperative agreement with, inter alia, the Ecuadorian Ministry of Agriculture on the use of Mancozeb;" and (3) "by using its overall influence and reach to essentially re-brand crop chemicals, such as Mancozeb, and the industry as a whole as safe." Pls.' Opp'n at 10 (citing Am. Compl. ¶¶ 2-4; 307-09; 360). The CropLife Defendants respond that the plaintiffs fail to adequately allege a claim of aiding and abetting, having referenced the theory only once in their extensive amended complaint, and argue that "the single reference to aiding and abetting . . . is more reasonably read as part of [the p]laintiffs' agency claim." Defs.' Reply at 12-13. Alternatively, the CropLife Defendant's posit that even if the plaintiffs have properly stated a claim that they aided and abetted at least one of the other defendants, the plaintiffs have neither "satisf[ied] the elements of aiding and abetting [nor have they] pled sufficient facts in support" of it.[31]  Id. at 13.

### a. Recognition of Aiding and Abetting as an Actionable Claim in the District of Columbia

Both parties rely upon the District of Columbia Circuit's decision in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), for their conflicting positions as to whether aiding and

---

[31]     The CropLife Defendants argue that because the plaintiffs have conceded "that they 'do not seek to hold [the CropLife Defendants] liable for the acts of their member companies' . . . [, CropLife A] or [CropLife I] cannot be held liable for aiding and abetting any alleged wrongful acts by any other [d]efendant." Defs.' Reply at 14 (citing Pls.' Opp'n at 15 n.9). This suggestion unfairly misconstrues the scope of plaintiffs' concession. See Pls.' Opp'n at 15 n.9.  The plaintiffs raised this argument as a part of their discussion regarding agency liability only, noting that they were not seeking to hold the CropLife Defendants "liable for the acts of its member companies but for [their] own egregious conduct and that of its own agents and employees." Id.  When read in context, the plaintiffs' did not concede that the CropLife Defendants can not be held liable for the actions of their member companies under any of their other theories of vicarious liability, but only under the theory that the plaintiffs are not seeking to hold the CropLife Defendants liable as agents of other defendants.

abetting is an actionable theory of vicarious liability in the District of Columbia. Pls.' Opp'n at 9-11; Defs.' Mem. at 13-14. This reliance may be misplaced. Although the <u>Halberstam</u> Court reasoned that that the "existence of the civil conspiracy action [in the District] suggests a high probability that the legal rationale underlying aiding-abetting would also be accepted," it was also careful to note that that "[t]he separate tort of aiding-abetting has not yet, to our knowledge, been recognized explicitly in the District." <u>See</u> 705 F.2d at 479. Since the decision in <u>Halberstam</u> was rendered, it remains unclear whether the District of Columbia Court of Appeals will recognize a claim of aiding and abetting. <u>See</u> <u>Flax v. Schertler</u>, 935 A.2d 1091, 1107-08 (D.C. 2007) (noting the enduring "uncertainty" as to whether courts in the District of Columbia "would recognize any claim for aiding and abetting a tort"). Indeed, in <u>Flax</u>, the District of Columbia Court of Appeals rejected the plaintiff's allegation of attorney malpractice based on her former attorney's failure to bring an aiding and abetting claim in an earlier case due to "[t]he uncertainty" as to whether it would even recognize aiding and abetting, which the Court found "significantly (if not fatally) undermine[d] any claim that the Lawyers were negligent in failing to bring such a claim." <u>Id.</u> at 1108.

There does not appear to be case law in the District of Columbia that explicitly recognizes aiding and abetting as an actionable theory of liability. Pls.' Opp'n at 9-11; Defs.' Mem. at 13-14. Although other members of this Court have at times embraced aiding and abetting as a theory of civil liability, it has typically occurred in situations where a plaintiff's attempt to hold a defendant liable under the doctrine has been rejected, <u>see, e.g.</u>, <u>Ungar v. Islamic Republic of Iran</u>, 211 F. Supp. 2d 91, 99 (D.D.C. 2002) (dismissing aiding and abetting claim for failure to state a claim), and thus these cases only arguably stand for the proposition that aiding and abetting is a colorable cause of action in the District of Columbia; <u>cf.</u> <u>Burnett</u>, 274 F. Supp.

2d at 104-105 (allowing plaintiff's aiding and abetting claim, but only where other theories of liability were also adequately pled and without discussing the state of law in the District of Columbia). Indeed, in <u>Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994), a case cited to by the plaintiffs, Pls.' Opp'n at 9, the Supreme Court noted that the doctrine of aiding and abetting liability "has been at best uncertain in application . . . with the common-law precedents 'largely confined to isolated acts of adolescents in rural society,'" 511 U.S. at 181-82 (1994) (quoting <u>Halberstam</u>, 705 F.2d at 489).

In sum, the status of aiding and abetting as an actionable theory in the District of Columbia remains uncertain, <u>see</u> <u>Flax</u>, 935 A.2d at 1107-08, and, as such, it is unclear whether this Court, which has jurisdiction based on diversity, should embrace the doctrine. However, because it is unlikely that the allegations in the amended complaint are sufficient to give rise to an actionable claim under the theory, it is unnecessary for the Court to address the question.

**b.    Survivability of the Plaintiffs' Aiding and Abetting Claim if it is Actionable in the District of Columbia[32]**

Assuming that aiding and abetting is an actionable theory upon which civil liability in the District of Columbia can be based, to survive a motion to dismiss the plaintiffs must have adequately pled the three essential elements of civil aiding and abetting. <u>See</u> <u>Burnett</u>, 274 F. Supp. 2d at 104-05. Those elements include: "(1) a wrongful act causing an injury by a party

---

[32]    Concerning the CropLife Defendants' argument that the plaintiffs neglected to plead aiding and abetting as a distinct theory of liability, the question is a close one. While the plaintiffs allege in one paragraph of their amended complaint that the defendants "aided and abetted . . . wrongful conduct" causing the plaintiffs to "suffer[] serious injuries," Am. Compl. ¶ 359, the CropLife Defendants suggest that this "solitary and seemingly gratuitous reference to 'aiding and abetting'" in the midst of a "154-page, 400-paragraph [amended c]omplaint" was insufficient to put the defendants on notice that the plaintiffs intended to rely upon the theory of aiding and abetting, Defs.' Reply at 12-13. However, given the liberal pleading standard of Federal Rule of Civil Procedure 8(a), the plaintiffs' amended complaint at least arguably provides the minimal degree of notice required by the Rule. <u>See</u> <u>Arent v. Shalala</u>, 70 F.3d 610, 618 (D.C. Cir. 1995) (finding lack of specifically not fatal where the "complaint [was] ambiguous on its face" because "the defendant [was] given 'fair notice' of the plaintiff's claim"); <u>Hanson v. Hoffmann</u>, 628 F.2d 42, 53 (D.C. Cir. 1980) (allowing claim to proceed where the complaint "did not explicitly" state the claim, on the grounds that the "basic factual allegation" had been made).

aided by the defendant; (2) the defendant's knowledge of his role as part of an overall illegal or tortious activity at the time that he provided assistance; and (3) the defendant's knowing and substantial assistance in the principal violation." <u>Ungar</u>, 211 F. Supp. 2d at 99 (quoting <u>Halberstam</u>, 705 F.2d at 477).

The plaintiffs have not adequately plead that the CropLife Defendants knowingly or substantially assisted a principal defendant in the commission of any tortious activity, and accordingly, their aiding and abetting theory of liability cannot be maintained. As just noted, in order to state a claim based on aiding and abetting, the plaintiffs were required to plead the CropLife Defendants' "knowledge of [their] role as part of an <u>overall illegal or tortious activity</u>." <u>Ungar</u>, 211 F. Supp. at 99 (emphasis added). Although the amended complaint asserts that the CropLife Defendants engaged in the "promotion and sale of Mancozeb" despite knowing about its toxicity, and "knowingly misrepresent[ing] its health hazards to the public," Am. Compl. ¶¶307-09, 356, the plaintiffs also seem to concede that promoting Mancozeb in Ecuador was not prohibited by the laws of that country, <u>see</u> Am. Compl. ¶ 7 (noting that Ecuador "lacks an effective regulatory framework for protecting workers and others exposed to agri-chemicals"); <u>id.</u> ¶ 305 (alleging that the defendants chose to market Mancozeb in a country where "the regulatory frameworks were weak and would <u>allow</u> the[ d]efendants to misrepresent the health hazards of Mancozeb") (emphasis added).[33] These apparently contradictory allegations are problematic because where some allegations in the complaint contradict other allegations, the conflicting allegations become "naked assertions devoid of further factual enhancement . . . [,

---

[33]     As a point of clarification, this is not to say that because the use of Mancozeb in Ecuador was not prohibited that none of the plaintiffs' claims have merit. Rather, to the extent that the plaintiffs bring claims that require them to plead the CropLife Defendants' <u>knowing</u> participation in illegal or tortious activity, the fact that the use of Mancozeb was not illegal in Ecuador discounts the plausibility of the allegation that the CropLife Defendants can be charged with having such knowledge.

which therefore] cannot be presumed true." See Ning Ye v. Holder, 644 F. Supp. 2d 112, 116 (D.D.C. 2009) (citing Iqbal, 129 S. Ct. at 1949) (internal quotation marks omitted). And, in any event, even assuming the truth of the plaintiffs' assertions, their concessions discount the plausibility of their theory that the CropLife Defendants knowingly participated in any tortious activity.

Moreover, the plaintiffs also fail to adequately plead that the CropLife Defendants provided "substantial assistance in the principal violation." Ungar, 211 F. Supp. 2d at 99 (emphasis added). Although the plaintiffs allege that the CropLife Defendants aided in the misrepresentation concerning Mancozeb's health hazards, they "have not [alleged how providing this purported] . . . assistance" to the other defendants, i.e., lobbying,[34] signing agreements, and re-branding chemicals, "extended to the 'principal violation[s],'" id. (rejecting the plaintiffs' aiding and abetting argument where no evidence was presented showing the defendant's assistance aided the underlying activity upon which liability was premised) (emphasis added), i.e., the underlying alleged "assault, battery, trespass, nuisance, [or] strict liability." Pls.' Opp'n at 11 (citing Am. Compl. ¶ 359). Simply stating that the CropLife Defendants generally provided aid to a third party, who in turn purportedly engaged in tortious activity, is not enough; rather, the plaintiffs are required to plead a link between the aid rendered and the principal violation (or violations) alleged. See Ungar, 211 F. Supp. 2d at 99. Here, the plaintiffs fail to

---

[34]        The CropLife Defendants argue to exclude evidence of their lobbying efforts as "speech protected by the Noerr-Pennington doctrine," which the CropLife Defendants contend are "efforts to petition the government [that] are protected by the First Amendment and may not form the basis for claims of civil liability." Defs.' Reply at 15. The Noerr-Pennington doctrine was adopted originally in the federal antitrust law arena, and its applicability in this jurisdiction with regards to common law torts remains ambiguous. See Covad Commc'ns Co. v. Bell Atlantic Corp., 398 F.3d 666, 677 (D.C. Cir. 2005) (noting that Noerr-Pennington provides immunity from liability "under the antitrust laws") (emphasis added); Whelan v. Abell, 48 F.3d 1247, 1254 (D.C. Cir. 1995) (merely assuming that Noerr-Pennington reaches common law torts, and even then only "in some sense"). The CropLife Defendants do not provide any legal authority from this jurisdiction stating that the doctrine necessarily applies to state common law tort claims, and the Court's efforts have not located any such authority. However, because the Court finds for the CropLife Defendants on other grounds, it is unnecessary to reconcile this seeming point of ambiguity.

allege how this link exists. Having failed to adequately plead these two essential elements of their aiding and abetting claim, assuming that a claim of this nature is even actionable in this jurisdiction, it cannot provide a basis upon which civil liability can be based.

> **2.    The Plaintiffs' Agency Theory of Liability**

The plaintiffs advance two theories of agency liability, urging that the CropLife Defendants can be held liable as: (1) the agents of their member companies, co-defendants in this case, and (2) principals of CropLife Ecuador. Pls.' Opp'n at 15. As to their first theory of agency liability, the plaintiffs assert that the CropLife Defendants, "on behalf of [their] individual members that produce and market Mancozeb . . . , acted as agents for [their member companies,] . . . creating and implementing the unlawful scheme to promote, market and utilize Mancozeb." Am. Compl. ¶¶ 305-06. As to their second theory, the plaintiffs allege that the CropLife Defendants "used their subsidiary entity in Ecuador, CropLife Ecuador, as its agent and/or alter-ego to serve as the representative voice for the promotion and sale of Mancozeb." Am. Compl. ¶ 307. In response, the CropLife Defendants argue that the plaintiffs "have failed to raise a plausible inference that an agency relationship exists between [CropLife A] or [CropLife I] and other defendants." Defs.' Mem. at 31. Specifically, the CropLife Defendants argue that any allegation of their control advanced by the plaintiff "is speculative, conclusory, and implausible," and as such does not satisfy the requisite pleading standard. Id. at 32.

In the District of Columbia, the determination of whether an agency relationship exists turns on several factors, including "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." District of Columbia v. Hampton, 666 A.2d 30, 38 (D.C. 1995) (citation omitted). Of these factors, the "'determinative

factor' is usually the . . . right to control an employee in the performance of a task and in its result." Id. at 38-39; see also Giles v. Shell Oil Corp., 487 A.2d 610, 611 (D.C. 1985) (stating that the "determination of the existence of [an agency] relationship basically turns upon one of these factors: control."). Indeed, "[i]t is a fundamental principle of hornbook agency law that an agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him.'" Carswell v. Air Line Pilots Ass'n Int'l, 540 F. Supp. 2d 107, 122 (D.D.C. 2008) (quoting Restatement (Second) of Agency § 14 (1958) ); see also Restatement (Third) of Agency § 1.01 (2006) (stating that an agency relationship is the "fiduciary relationship that arises when [a principal] manifests assent to [an agent] that the agent shall act on the principal's behalf and subject to the principal's control").

The first agency argument advanced by the plaintiffs – that the CropLife Defendants served as the agents of their member companies – is not actually an argument premised upon agency liability as set forth by the plaintiffs; instead, if anything, it suggests the reverse – lack of liability on the part of the CropLife Defendants – and therefore the Court cannot find that it states an actionable claim under agency theory. Specifically, the plaintiffs seemingly incongruent statement that they "do not seek to hold [the CropLife Defendants] liable for the acts of their member companies, but for [the CropLife Defendants'] own egregious conduct," Pls.' Opp'n at 15 n.9 (emphasis in original), does not square with this theory of liability. This inevitable reality is because if the CropLife Defendants were in fact acting at the behest of their members, they would be the agents of their members (the principals) and not the reverse. Agency theory assigns liability to the principal, not the agent, and therefore were the plaintiffs' first agency theory of liability accepted – that the CropLife Defendants were acting at the direction of the members – the CropLife Defendants would be able to seek protection from

liability under the agency theory itself. See Hayes v. Chartered Health Plan, 360 F. Supp. 2d 84, 90 (D.D.C. 2004) (discussing how vicarious liability is "a legal concept employed to transfer liability from an agent to a principal at trial") (emphasis added). Given this irreconcilable contradiction, the Court will not assume that the plaintiffs intended this result and therefore it cannot find that the plaintiffs have stated a basis for finding liability under their first theory.

As to the plaintiffs' second theory – that the CropLife Defendants were principals and defendant CropLife Ecuador was their agent[35] – the plaintiffs fail to adequately plead the element of control.[36] Specifically, the plaintiffs assert that "CropLife Ecuador is a mere instrumentality . . . under the complete control of" the CropLife Defendants and "all of [CropLife Ecuador's] actions relevant to [the p]laintiffs' injuries were done in furtherance of [the CropLife Defendants'] plan . . . ." Am. Compl. ¶ 311. In support of this allegation, the plaintiffs offer "two complementary" examples of such control. Id. ¶ 307. First, they allege that the defendants "used CropLife Ecuador to initiate a campaign to falsely promote Mancozeb as a 'green' product," resulting in "the representative of CropLife in Ecuador, Fernando García, . . . aggressively promot[ing] the use of Mancozeb and its 'green' designation." Id. And second, the plaintiffs allege that the CropLife Defendants "used their subsidiaries in Ecuador to participate in

---

[35] The amended complaint does not allege that either CropLife A or CropLife I maintained any employees in Ecuador, so the only conceivable manner in which these defendants could be held liable for tortious activity in Ecuador would result from vicarious liability occasioned by an agency relationship with CropLife Ecuador.

[36] As an initial matter, the plaintiffs' argument that the existence of an agency relationship is a "question[] of fact inappropriate for resolution on a motion to dismiss" misconstrues the procedural posture of this case. Pls.' Opp'n at 18. While a factual dispute over whether an agency relationship exists might bar a grant of summary judgment, at this stage in the case the question is not whether the plaintiffs have raised any genuine issue of material fact, but whether, focusing on the allegations in the complaint, the plaintiffs have adequately pled the elements of agency liability. See City of Moundridge v. Exxon Mobil Corp., 250 F.R.D. 1, *5 (D.D.C. 2008) (noting "that at the pleading stage, the concern [is] not with the particularity of the factual allegations, but with whether the complaint 'in toto ... render[s] plaintiffs' entitlement to relief plausible'") (citing Twombly, 550 U.S. at 569 n.14). In such an analysis, an examination of whether the plaintiffs have pled the existence of an agency relationship is entirely appropriate.

42

assisting CropLife Ecuador in promoting the use of Mancozeb despite its known health hazards." Id. ¶ 308.

The shortcoming of the plaintiffs' theory of the CropLife Defendants' purported control – that CropLife Ecuador was "under the complete control of" the CropLife Defendants, Pls.' Opp'n at 17, – is that it is completely conclusory and lacking the necessary factual support to survive dismissal under Rule 12(b)(6). Neither of the two examples put forth by the plaintiffs substantiate the assertion that the CropLife Defendants could or actually did exercise control over defendant CropLife Ecuador, nor do the reasonable inferences that can be drawn from them suffice as a basis for finding that the requisite control has been adequately pled. For example, even if CropLife Ecuador engaged in a campaign to falsely promote the safety of Mancozeb, that action does not reasonably lead to the conclusion the CropLife Defendants had the right to order such an undertaking, or that it actually exercised such a right. Nor does the plaintiffs' factual information concerning the CropLife Defendants' "subsidiaries" in Ecuador explain who allegedly assisted CropLife Ecuador in promoting the use of Mancozeb. See Am. Compl. ¶ 307 (concluding that CropLife Ecuador is a subsidiary of CropLife A and CropLife I without any supporting factual allegations); id. ¶ 308 (asserting without any factual support that the CropLife Defendant have "subsidiaries in Ecuador" that "assist[ed] CropLife Ecuador"); id. ¶ 310 (baldly concluding that the CropLife Defendants, along with the other defendants, used "their Ecuadoran divisions, subsidiaries, or agents" "in the promotion and unlawful use of Mancozeb in Ecuador"). At most, it can be inferred from these allegations that the CropLife Defendants and CropLife Ecuador shared a common interest in promoting the use of Mancozeb, but "[r]egardless of how united [two parties] might be with respect to any particular issue, there can be no principal-agent relationship absent some indication that the position of one of the entities was taken at the

direction of the other." Carswell, 540 F. Supp. 2d at 124 (emphasis added). And to show that such action was taken at the direction of another requires more than just the conclusion that that is what occurred. See Butera & Andrews v. IBM Corp., 456 F. Supp. 2d 104, 111 (D.D.C. 2006) (granting defendant's motion to dismiss for failure to state a claim upon finding that the plaintiff had "adduced no facts to suggest that, in carrying out the complained-of attacks, [the alleged agent] was acting as [the defendant's] agent as that term is understood in the law."). Because the plaintiffs' allegation that CropLife Ecuador was subject to the CropLife Defendants' control is nothing more than "formulaic recitation of [an] element[] of" agency liability," it is "conclusory, and not entitled to be assumed true." Iqbal, 129 S. Ct. at 1951 (citation omitted).

Ultimately, the plaintiffs assert nothing more than allegations that are "'merely consistent with' [CropLife Ecuador's] liability," which alone does not allow this Court "to draw the reasonable inference that" CropLife Ecuador was ever subject to the control of the CropLife Defendants, in theory or in practice. Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 557). Because the plaintiffs have failed to adequately plead the essential element of control, their claim that the CropLife Defendants are liable under agency principles must be dismissed.

### 3.      The Plaintiffs' Theory of Conspiracy Liability

The plaintiffs allege that the CropLife Defendants, along with other defendants, "conspired to provide false and misleading information to the public, the government of Ecuador, and those involved in the application of Mancozeb on banana plantations, regarding the dangers of the chemical." Am. Compl. ¶ 4. This alleged conspiracy was accomplished through the defendants' promotion of Mancozeb as having "no adverse effects on humans, when [the alleged conspirators purportedly] knew . . . the chemical was hazardous to humans." Id. According to the amended complaint, "[t]he major known consequence of this [conspiracy] was

that [the plaintiffs] suffered serious injuries." Id. ¶ 359. The CropLife Defendants respond that the "[p]laintiffs' claims are utterly baseless and antithetical to the operations of these trade associations," Defs.' Mem. at 25, and that the plaintiffs fail to "allege any relationship [between the CropLife Defendants and any other defendant] that amounts to anything more than the ordinary relationship between a trade association and its members." Id. at 26.

In order to survive a motion to dismiss for failure to state a claim of civil conspiracy under District of Columbia law, a complaint must allege with some factual support: "'(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.'" Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 738 (D.C. 2000) (citation omitted). The question of whether a conspiracy theory has been adequately pled often turns upon the existence of an agreement, which is the "essential element of a conspiracy claim," Graves v. United States, 961 F. Supp. 314, 320 (D.D.C. 1997), and in pleading that a defendant entered into an agreement the "plaintiff must set forth more than just conclusory allegations of [the] agreement . . . ." Brady, 360 F. Supp. 2d at 104 (citing Graves, 961 F. Supp. at 321). Here, although the plaintiffs allege the existence of an agreement, this allegation is not buttressed with any factual support, rendering the pleading deficient.[37] Namely, the plaintiffs fail to adequately plead the existence of an agreement between the CropLife Defendants and any other entity to

---

[37] The CropLife Defendants argue that because "[t]he heart of Plaintiffs' allegations against [them] is that they promoted [M]ancozeb as safe despite knowing that it was not," the plaintiffs' claims "sound in fraud," and as such must be pled with particularity in accord with Rule 9(b). Defs.' Mem. at 8. Generally, "[t]here is no heightened pleading requirement for civil conspiracy, nor is civil conspiracy exempt from the operation of Rule 8(a)." Burnett, 274 F. Supp. 2d 86 at 103 & 110. While the CropLife Defendants may be correct that when an allegation of conspiracy sounds in fraud it is subject to heightened pleading standards, because the plaintiffs do not satisfy even the pleading standard of Rule 8(a), it is unnecessary to apply the requirements of Rule 9(b), even if the defendants' position that Rule 9(b) controls is correct.

participate in an unlawful act, or a lawful act in an unlawful manner. In their attempt to substantiate the existence of an agreement, the plaintiffs allege that the CropLife Defendants, along with the other named defendants, "acted in concert to promote heavy usage of Mancozeb," Am. Compl. ¶ 7, "conspir[ing] to provide false and misleading information . . . regarding the dangers of the chemical," Am. Compl. ¶ 4, in order to "ensure that there would be a market for the unlawful use of Mancozeb . . . ." Am. Compl. ¶ 308. However, these allegations are purely conclusory, and devoid of any factual support. Fatal then to the plaintiffs' conspiracy theory claim is the failure of their amended complaint to provide any indication of when or how such an agreement was brokered, or how the CropLife Defendants specifically, as opposed to all the named defendants generally, were parties to an agreement. See Bush v. Butler, 521 F. Supp. 2d 63, 68-69 (D.D.C. 2007) (dismissing conspiracy claim where plaintiff's allegation of an agreement "provide[d] no description of the [specific] persons involved in the agreement, the nature of the agreement, [or] what particular acts were taken to form the conspiracy"); McCreary v. Heath, No. 04-0623(PLF), 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005) (dismissing conspiracy claim when the plaintiff's "162-page complaint fail[ed] to allege the existence of any events, conversations, or documents indicating that there was ever an agreement or 'meeting of the minds' between any of the defendants") (emphasis added). Under Twombly, a plaintiff asserting conspiracy liability is required to plead more than mere "parallel conduct that could just as well be independent action," but must make allegations "placed in a context that raise[] a suggestion of a preceding agreement . . . ." 550 U.S. at 557. Here, the plaintiffs provide virtually no factual support that even tends to support the existence of an agreement between the CropLife Defendants and any other person or entity. In fact, on the basis of what is alleged in the amended complaint, the actions of the CropLife Defendants, even assuming that those

allegations are true, could just as easily be the result of their independent actions.[38] Cf. City of Moundridge, 250 F.R.D. at 5 (refusing to find that an agreement had not been adequately pled where plaintiff provided "circumstantial facts, including historical supply and consumption levels, market prices, profit levels, and the use of industry reports, to support [the] inference that the defendants engaged in not merely parallel conduct, but rather agreed to [commit illegal acts].").

In sum, stripped of its factual and legal conclusions, the plaintiffs' amended complaint paints a maze from which it cannot be discerned with whom the plaintiffs are alleging the CropLife Defendants conspired, when the alleged agreement was reached, and what particular activity was the object of the conspiracy. See generally Am. Compl. Similar to the amended complaint that the Supreme Court in Twombly deemed deficient, the amended complaint here "mentions no specific time, place, or person involved in the alleged conspiracies," resulting in the CropLife Defendants having "no clue" as to how they "supposedly agreed . . . [to an] illicit agreement." 550 U.S. at 565 n.10. Despite the plaintiffs' efforts to have their conspiracy theory stand on conclusory allegations alone, the case law is clear that merely asserting the existence of an agreement without providing any facts "suggesting that the defendants were acting in concert in furtherance of a shared goal" renders a complaint deficient.[39] See Brady, 360 F. Supp. 2d at 104. Accordingly, the plaintiffs' conspiracy theory cannot be maintained.

---

[38] Indeed, although the Complaint is over 150 pages in length, it provides only one factual allegation as to the nature of the alleged agreement brokered: the naked assertion that "[t]he decisions made as to the scheme were made and implemented in the District of Columbia." Am. Compl. ¶ 306. To infer the existence of an agreement on this basis alone would, in effect, allow a party to state a claim for conspiracy simply by identifying a location where it was allegedly consummated without providing any further factual support for the existence of the conspiracy. See Brady, 360 F. Supp. 2d at 104.

[39] To the extent that the plaintiffs seek to excuse their failure to plead the existence of a conspiratorial agreement based on the doctrine of lack of access to information necessary to substantiate the position, as discussed

(continued . . . )

# V.  CONCLUSION

For the foregoing reasons, the plaintiffs have failed to state a claim under which the CropLife Defendants could be held liable, under either a theory of direct or vicarious liability, and thus the CropLife Defendants' motion to dismiss must be granted in full.  However , the claims are dismissed without prejudice, <u>Andrx Pharms, Inc. v. Biovail Corp. Int'l.</u>, 256 F.3d 799, 807 (D.C. Cir. 2001) (stating that motion seeking dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) should only be granted with prejudice when the Court determines, as a matter of law, that "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."), and therefore if the plaintiffs are able to remedy the deficiencies found by the court consistent with the foregoing analysis, they are welcomed to attempt to do so pursuant to Federal Rule of Civil Procedure 15.

_____/s/_____
REGGIE B. WALTON
United States District Judge

---

(. . . continued)
above, the plaintiffs have not adequately pled a foundation that would allow the Court to grant an exception to what is otherwise required by the Federal Rules of Civil Procedure and applicable case law.